Thank you. First case is M.G.J. v. School District. Good morning, Your Honor. Good morning. May it please the Court, my name is Joseph Montgomery, and I represent the appellant, Princess Johnson, on behalf of her daughter, M.G.J. I respectfully request to reserve four minutes of time for rebuttal. Okay. Okay, thank you. May I proceed? Sure. Thank you. So, M.G.J. is a student with multiple disabilities, including autism spectrum disorder and intellectual disabilities, what we formerly called MR, mental retardation. She's a child with a disability within the meaning of the individuals with disabilities. We know that. Yes. Let me ask this. What is your submission in terms of what the school should have done? What should they have done here? Let's assume state action and all that, which is a big hurdle to get past, but assuming that that is there, what should they have done? Absolutely. Judge McKee, thank you for the question. Based on the Ings-Ray case, we see what Judge Kearney called the model response, right? Right, and that's the key word. That was a model. Right. One could certainly argue anything Judge Kearney suggested. They went above and beyond what the law required them to do. In the Ings case. Right. Correct, and I would agree with Judge Kearney, and I think there was language that said they could not have done more. I would argue in this case, Philadelphia could not have done less. I don't really think they did anything at all. I know Judge Kearney cites to the March incident, right? So, the incident that preceded the February 2016 incident, February 2017 incident, the March 30th incident, there's an email. Judge Kearney cites ultimately to PSDD-059 in the district's appendix. That document's blurred out. In all fairness to the court, I believe he's citing to an email that we do have. It's JA-343. In this email, and again, what we have in the depositions is a very self-serving email, no date on it, no signature of who wrote the document attached to the email. There is, it's calling mom a liar, right? It's saying, we don't think this happened. We're going to move the students in the classroom. That's the extent of what they claim to have done. But we believe that's the issue. Wait a second, but also it said, we are going to separate the students in the class. We're going to keep notations regarding activities to share with the mother. We're going to notify the art teacher. Not sure why that was of consequence. Maybe because that was a room they moved to. I don't know. And even though the teacher said she had a different view of what occurred and thought the student gave her account to get attention, we focus on the school's reaction. And they did react. And 11 months passed before something else happened. And after that, a second event, the school put in a safety plan, called the Special Victims Unit of the Philadelphia Police Department. What more should they have done? Right, so to me, we argue the most important interventions are after, between the first incident and the second incident, right? So for Title IX, they have to have knowledge, and there's knowledge, but it's how we respond to the knowledge that shows whether there's deliberate indifference. Excuse me, knowledge of what? Knowledge of the first incident? Knowledge that something is occurring, right? Something of a sexual nature is occurring between the students. I guess the question is, based on that knowledge, what should they have done? Based on that knowledge, what they should have done. First, Judge Fuentes and Judge Schwartz, there's a question of fact if the school really did this, right? Even in this document, they say, parent doesn't believe us. Parent doesn't believe any of this happened. Judge Kearney accepted this document is true. We don't think the children were really moved. But there's nothing in the record to suggest it didn't happen. You didn't probe and ask in deposition was there an actualizing of these tasks. There was questions about this. The school stands by that this is what they did. Mother's testimony is that they did not, in fact, do this. And in their very email, it says, court's indulgence is for one moment, mom believes I'm a liar, right? So the employee that drafted this document acknowledges in the document that mom doesn't believe her. She doesn't believe that these things are actually occurring. We don't believe these things actually occurred. Belief isn't what we can focus on when we're evaluating a summary judgment record. It's whether there's evidence in the record in front of us to demonstrate that a reasonable, that no reasonable juror could find that they were deliberately indifferent. And I understand what you're saying is that there's a perception by this one author about whether there's a truthfulness to the student's account. But our focus is what did the school do? Right. So if we accept that what they said they did, right, we don't believe that what they said they did they actually did. If we say even what they said they did wouldn't be enough. So the model response, school investigated the incident. There's no investigation report. There's this document that's created after mom speaks with them. So if they acted as though it were true, would they have to also do an investigation? Because they were limited. As I read the record, there was only one class there. It wasn't that they could separate the kids and put them in different classes. Right, and that goes to the Title 2 ADA claim that they should have come up with other accommodations. That's a self-made restraint. That's a man-made restraint. They could have created, they could have broken that class up. They could have accepted new students in. So to the ADA claim, there was much more they could have done. So you can't say we have this man-made restraint that in our school, every program you make, your schools make your life skills programs. So that's why in the beginning, just to make it clear, M.G.J. gets the most basic of services in schools. It's learning how to tie your shoe, life skills, learning how to wash yourself, zip up your coat. You can create another one of these classrooms the way this school does it. And it's fair to do that reckless indifference. It is possible. Let's assume that it is possible. Maybe it isn't. Maybe possible, not practical. Let's assume that it's both possible and practical. Does the failure to do that rise to the level of reckless indifference? Absolutely. And if you deliberate, absolutely, Judge McKee, there is maybe five to ten students in these classes. Right. So even if you separate them, they're not separate. You can move children to another school. You can change the age grouping. Is that what they should have done? I mean, what did they specifically fail to do that they should have done? Right. So in this document, and again, if we accept this document to be true, which we believe it's a question of fact whether the school did anything, they only did it during classroom time. They did what? They just moved the kids' seats. So it's a classroom a quarter the size of this. Same classroom. Same classroom. They just separate seats. Instead of you sitting there, you sit there, and Judge Fuentes sits where Judge Schwartz is, and Judge Schwartz sits where Judge Fuentes is, and nothing changes. So you say it's reckless indifference because they should have put them in separate classrooms. At the least, they should have put them in separate classrooms once they see this is going on. But the issue wasn't necessarily the classroom. It's the unstructured time. Were there separate classrooms that would have addressed the educational requirement for both students? Based on the model that the – Or separate programs. Don't put the model into it. Were there separate classrooms? And the answer is no. Based on the model that – No, based upon the actuality. As the record reflects, there were two classrooms. In this school. In this school, one for basically students who were 18 and older, and one for students who were less than 18, correct? Correct. Okay, so there were two classrooms. Correct. Two life skills classrooms, age groups. Did anything wrong take place while they were both in that same classroom? Yes. I thought that there was contact, inappropriate contact, outside the classroom. Yes, so it was – The classroom, there was some kind of construction, something going on in the classroom. So they were having their classroom in the library in an alternate setting, which was a little bit more unstructured than the normal classroom. So with the autism diagnosis, these are children that don't do well with change. They want consistency. During these unstructured times, which even though it's classroom time, it's in a different environment, right? So, yes, it's classroom time, but it's a different environment. Different environment. In other words, it took place outside the classroom. Outside of what we would call a classroom. The classroom was the library. Right. Okay, so putting them in different classrooms wouldn't have been of any help. If they were in separate classrooms. Correct. But the unstructured time at lunch, they were still sitting next to each other, completely unsupervised. You've been focused on the first event. Is that the only event you're bringing your claim based on, that there was a reckless indifference after the event of March 2015? The March 2015 event gives the knowledge. So under the Title IX claim, the district had actual knowledge of the harassment that was ongoing. Not only was there the incident between MGJ and RD, there were other incidents that MGJ witnessed, other students involving sexual encounters between other students that she witnessed that maybe increased her own sexual responsiveness. Is it your position that the March 2016 event is not a cause? You're not bringing a claim based on that? You're not saying they were recklessly indifferent after the 2016 event, are you? No. No, Judge Roach. I've asked a bad question. You gave me a no. We got double negatives. Are you relying on the March 2016 event as a basis for your claim? Yes, as a basis of knowledge. Simply for knowledge, but not for relief. Correct. To paraphrase, is it your position that the ADA claim, the 1983 claim, the Title IX claim are based on the events of the February incident itself? The February incident ultimately gave rise, yes. The February incident, correct, yes. Which, again, and with all due respect, Judge Roach, I know you said it was 11 months after, and I know Judge Kearney said, oh, it was 11 months after, but I don't know that that makes it any better. You know, we haven't had a sexual assault in 11 months. I don't think that that time frame, I don't think that that's a significant amount of time frame. I think it was two years in Ings Ray between the two incidents. And, again, back to the Ings Ray response, they investigated, they suspended, we could have suspended the assailant. Bill, is that what the school is required to do under Davis and TLO? Those Supreme Court cases suggest that there should be some deference given to the school when it goes to discipline. And I'll even agree with you further, Judge, because the other student was also a student with special needs who received extra support. So we don't get to know what happened. You know, frankly, as I represent this person, I don't necessarily get to know what happens to the other person at the lower levels of court, what happens to the assailant. And, again, frankly, it doesn't necessarily matter as long as my client, MGJ, is protected. So whatever they do, they should separate them. If that means put it – and, again, yes, there were two classrooms in this school, Swenson, but this is a school district of Philadelphia where there's hundreds of schools and hundreds of programs and approved private placements, and you don't have to limit yourself to your man-made restrictions. You said we have two programs here. What if there's one? It doesn't matter there's two programs. What if there's one program, one life skills program? Can you just tell us in response, I think maybe to Judge Fuentes' question, that a student with certain needs to disrupt the environment in which they're being educated can be very harmful? So would that be a reasonable response here? When you look at the totality of the facts, could a reasonable juror say that that would make sense to do? Absolutely, absolutely, because the potential harm to have someone in your classroom that not only is there sexual conduct going on between them, but there's also documentation in the records that the conduct between them is disruptive. I think the school said, oh, she would just like to play with him. She was always distracted. Beyond that, yes, it would have been a good idea. It takes time to settle in, but, of course, that time to settle in is worth it for the ultimate protection, not to be ultimately sexually assaulted. Yeah, and, in fact, an IEP, again, it's a fluid document. It's always changing. You can always revisit it, and it's actually a good time to collect baseline data and monitor progress when we do make this change. Not when it's just, okay, we're going to the library today. We're going to go do class outside today. Those events could be disruptive, but when it's done in a calculated way where we're actually measuring data, it can actually be beneficial to the student. There was no request for a change in the IEP, though, was there? That's what the school should have convened, an IEP meeting. And this is the school's duty. They should have convened an IEP meeting and said, hey, what's going on? What you're talking about is not the kind of thing one would think, and both you and your colleagues know a lot more about IEPs, I think, than I do. But it doesn't seem to be the kind of thing that would go into an individualized educational plan when we're focused on the plan for the kid's education. What can we do to give this person the best possible education within the limitations that we have? You're talking more about an IEP and that projection. Clearly, I guess projection has to be there for the person to learn. And correct me if I'm wrong, I didn't necessarily equate the two, that that kind of contract would be built into an IEP. Indeed, Your Honor. That is, with all due respect, a common misconception because the word education is in there, right? So when we automatically think of education, we think of academics, we think of math and history. But for this youngster, education was really anything but. Life skills. Right, so it was life skills. It was behavior. It was social and emotional. And this is what wasn't – and in the Ng's case, which was really nice that they did, was there should be a sexual education. She's 15 years old. Hormones. Let's remember, though, what the facts out of which the description as she gave what happened in February was a type of potential touching, right? I'm sorry. We have to remember the factual scenario out of which the events occurred. It was sort of hands being placed on each other. For the ultimate, the February, the ultimate event? For the event, for the February event, what happened in the library, right? Yes. We just want to, for the benefit of the record, to be clear. We're not talking about a sexual assault here in a criminal sense. It was an inappropriate touching. February 18 was absolutely a sexual assault. Do you follow me? No, the February 18th was a sexual assault. February 18, 2016. But there was no penetration. There was no – She's nonverbal. This other child is nonverbal. Well, you have a description, right? We're going to assume the description given is the accurate description of the event, correct? The description was that he likely rubbed his genitalia against hers and pulled her pants down and blew on her stomach. That was in March. We're talking about February in the library. So the February 18th was the outside incident. The March incident was the library incident. And that's where we – I'm sorry. I want to talk about the years. You told me that the cause of action out of which you're basing your events is the first event, correct? March of 2015? Correct. Right? Not February 2016. Right. That's what we believe gave knowledge that there was inappropriate sexual behavior. And that is your basis of your cause of action. Right. And at that – given the nature of the event as described, which might have been, I think Judge Montage, you're right, is an offensive touching, correct? You're suggesting that there should have been a change to the IEP. Is that what you're saying would have been the reasonable response here? In our motion in the documents, it's the allegations that he exposed his penis to her, attempted to force her to fondle him on multiple occasions. We're talking on multiple occasions. I thought there was only one occasion in February and then a second one in March. The February occasion, right. But there's other events that she spoke of after that. But I thought those dealt with other – that observations of other students and their interactions with each other. Our focus is only want to happen to your client. That's right. Am I correct that there were two episodes, or are you representing to me in the record there were multiple episodes involving your client? And this particular boy, right. You've got to answer my question. Was there an event in 2015? Was there an event in 2016 between the two of them? Yes. Were there any others between the two of them? That came to light – we don't – there was two incident reports. But after the 15 event, it came – we know about the one, but to the best that she could articulate, there were other times where this happened. Where in the record does that appear? JA-340. JA-340. And that's – your representation is at JA-340. There were other events between this student and this other student. Yes. Events, I assume, offensive touching? Correct. And was the school on notice of those other episodes after February? They were on – They come to light after March – after 2016. Forget the months. After she left the school. Yes. Yes what? Yes, mother – yes, the school was on notice, but they didn't believe mother. They didn't call Childline. They didn't call SVU. They didn't investigate. They didn't follow up. Again, these students are – and – But you're saying that the school was on notice between 2015 and 2016 of multiple incidents between your client and RD. Is that your representation? That's our representation. And is your representation they did nothing, being on notice of multiple episodes between MG, J, and RG? We say that they – And is that supported by the record? Yes, but we say that if we don't – there's an email that says they switched their seats and there was supposed to be closer supervision. As you point out, Judge Schwartz, there's supposed to be notes. We don't have any notes or data or records saying, okay, today – With children like this, you would expect that there would be notes that said, okay, today they didn't communicate. Today we talked about proper ways to interact socially. There's none of the notes that you spoke of that should have been there. All there is – yes, sir? You do have a claim under Monell. You seek to impose municipal liability under Monell. And I wanted to ask you, what municipal policy do you claim caused MJG's harm in this case? What policy? Court's indulgence is for one moment. Are you abandoning that claim? No, no, no. We're not. But we're saying that it's not necessary for plaintiffs to show that state-created danger exception with the Shaney Doctrine with the municipal liability. It was under the district's failure to keep – But you have to show that some policy resulted in the child's harm in this case. There is a link, municipal policy. And I'm asking you, what was that that caused MJG's harm? Or maybe I can just ask you, why don't you flesh out the substance of your Monell claim? Thank you, Judge. Well, actually, the light is on. While your opponent is speaking, maybe you can take a look at the record and come back prepared to – you serve four minutes. Come back prepared to address your Monell claim. And let's try agreeing that the Monell claim is, in fact, what gives rise to the state-created danger. And maybe you're combining the two. The two are the same doctrines, but maybe you're saying the policies of the state, of the school district, were what, in fact, created the danger that you're relying upon, the knife line of cases for state-created danger. That may be where you're going. I don't know. But take a look at the verdicts and then let us know when you come back. Take a seat. Thank you. You can stand up if you want to, just as long as – It's a lot healthier, actually, to stand than to sit. But that's totally up to you. Morning, Your Honors. Morning. Gary Sams of Obermeyer, Redmond, Maxwell, and Hipple on behalf of Carson Valley. The appellees have agreed to split the time five minutes for myself, ten minutes for Mr. Scott, with the court's permission. I'm sorry. Who do you represent? Which party do you represent? I represent Children's Valley, or Carson Valley. I'm sorry. Essentially, the claim that the appellants are trying to make is that Carson Valley is somehow a state actor or acting under the color of the state. That is simply not the true facts of this case. As this court is well aware, Carson Valley is a nonprofit that was retained to assist with the support that this child had. Essentially, we provided the therapeutic support staff. And totally independent of the municipality and the education system? That's correct. Independent contractor? Correct. And it was even further, it was an independent contractor for us that we had retained to come and provide those services. Who is that, the independent contractor that you retained? I'm sorry, the independent contractor? You retained. Who is that? The actual individual, the name of the individual, or the service we used? Well, you answered the question. You retained an individual, an expert in this field, I guess, to provide the services that you thought were recommended. And I assume the services you thought were recommended, you recommended to the school district or the individual school. And then that school made the decision as to whether or not to accept your advice. And if they accepted it, the person who you retained to provide the services, or actually the school retained to provide the services, would come in and have to provide the services? Not actually, Your Honor, if I may. Sure. Actually, we're even further removed from that. That's why essentially our whole position is that we never substitute our judgment. We weren't even allowed to provide our judgment, quite frankly, with respect to the services that were provided. What happened is that there was an organization by the name of Green Tree that was part of the IEP team and provided this service before we got involved. There was a treatment plan created between Green Tree and Community Health and some other folks to come up with for this. We had nothing to do with the plan or the hours that were suggested that she have a TSS in this case. You have nothing to do with determining MJG's care? Well, we did at a later point. Essentially what we were looking at is we stepped into the role of Green Tree and what they had decided under the treatment plan. And this happened during the time period after we took over, but under Green Tree and Community Health's plan that they had created. After the incident. Once you stepped in, they may have created a plan, but basically the plan was something you signed off on, agreed to. It may not be accurate to say it's your plan, but you adopted the plan. We adopted the plan and acted under the plan. But in fact, after this incident, we had a psychologist come out and see the child who recommended instead of the 15 hours that Green Tree and Community Health had agreed to as saying was medically necessary for the child, we suggested 32 hours. But that was a suggestion after the February 16th. That's correct, but that's the first time we're really involved in altering the treatment plan. I'm sorry, what specifically was your suggestion? So you were aware of the first assault? No, we were not. You were not. We were not, and the principal of Swenson testified to that, as did Ms. Lynch, that we were never made aware of. We were never made aware of any assault. Of any incident or alleged incident in the library, the first one. But we had a TSS assigned to the case and caring for the student at the time of the second, but she was not assigned to that student that day, if that helps. What was the state negligence claim? That was filed against you? The state negligence claim Judge Carney decided not to act upon other than to dismiss and allow it to be brought in the state negligence claim, and I think the claim there was that we should have done more to make sure somebody was with her at all times. As it is with TSSs and the support they give, the therapeutic support, they're never with the kids at lunchtime, but because she was only allotted 15 hours, our support staff was typically with her two or three days a week. I think Judge McHugh might have been asking you, though, what's the state of the cause of action on the negligence claim where the district court declined supplemental jurisdiction? What's the status of it? Oh, it's never been followed up on, so I read too much into the question. No problem. Does Carson Valley provide services to both public school students and non-public school students? Yes, they do. That's correct. And the funding for services for a student like the one we have here comes through sort of the state's Medicaid program? In a roundabout way, the state's involved in funding for some of our students, not all of the people we work with, obviously, but that alone, as this Court is well aware, is not enough to make somebody a state actor, I would maintain. And is it fair, does the record support the following statement, that it was the mom of the student who secured the services first for Green Tree and then when Carson Valley stepped in, or was the school the one that caused these services to be provided? Actually, you're right. The mother had come in and asked us to take over for Green Tree and then we became involved. That is my time. Thank you very much. I appreciate it. Thank you. Good morning. Jeffrey Scott from the law firm of Archer and Greiner on behalf of the Philadelphia School District. We would urge this Court to affirm Judge Kerndy as it all accounts against the school district. As to the Title IX count, the judge, I think it was footnote 85, made it clear that the plaintiffs never responded to the school district's motion for summary judgment on Title IX. So it's our position that they've waived all their arguments under Title IX and the Third Circuit. But even so, the element that's common in the various claims is whether or not there's been deliberate indifference by the school as it relates to these episodes, correct? It's true. And I understand that. And there was another case from the school district. It was the Chambers versus the school district case. And in that case, the court lower, actually the Third Circuit ruled that there was no deliberate indifference under 1983, yet it allowed the rehabilitation claim under Section 504 to go back down the trial because there were two separate causes of action. Well, here we have multiple causes of action. Each of them have a common element, which is deliberate indifference. Should we have a jury decide whether the school's response was a reasonable response or reflected deliberate indifference? Or is it your position, based on the record in front of us, no reasonable juror could find all those cases? Well, I would say there's no reasonable jury that could come to the conclusion that what Ms. Lynch did was not clearly unreasonable. That's the standard. In other words, the court in the Supreme Court and the Third Circuit has held that when there's an incident, one report, deference is given to the school officials. Could you respond to your adversary's representation that the record, from his point of view, reflects multiple episodes between the first incident in 15 and the second incident in 16? The record is void of multiple instances. There was one incident that was reported by Ms. Smales. This was back in the February 15 incident, where she then reported it to inappropriate – touching inappropriate contact to Ms. Lynch. Ms. Lynch then convened the meeting after spring break at Ma's request. There was a meeting between mom, the child, I believe the sister, and Ms. Lynch put a plan in place where she would separate the students in their grade level in their class. Life skills class was between 14 and 17 years old. Separated how? Would you be – They separated them. Physical separation. They separated them in the classroom, and she also informed the teachers in the classroom to make sure that you keep an eye on the children in the classroom. So she took steps. Might that not have contributed to the problem itself, keeping them in the same classroom? It's possible, I can say, Judge Fuentes. But I don't think it rose to the level of being clearly unreasonable because nothing else had taken place between the time of that incident until the following school year all the way through. I think of the classes. I'm sorry, Your Honor. What's the class size that she was in? I don't know the answer to that, Your Honor. We didn't – there was no discovery taken on the class size on that. Usually – I can't say usually, but the class sizes, I cannot tell you the answer to that. It sounds like you didn't anticipate that there would be a problem, but in fact there was a problem. It's possible. There was another physical sexual contact. Later on. That's not being pursued in this action under Title IX. When you say later on, it was later on. In other words, the second act took place in 2016. Well, the idea is you should have taken steps to prevent that second sexual contact because of the first sexual contact. In other words, you were on notice that this might happen again. At least I understand that's the plaintiff's case. I understand that's their position, but I think when a district has knowledge and then when its efforts, not its first effort, but its maybe second or third efforts, continue to result in the same kind of harassment, then I think there may rise to a level of deliberate indifference. What we have here is one report, and then what we have here is the students were separated, the teachers were on notice, the teachers were watching them, and nothing happened for that 11-month period. Well, Mr. Montgomery is arguing they weren't really separated. Spatially they were rearranged, but they weren't really separated. Yes, but the facts and the records show that there was no inappropriate touching or inappropriate conduct between the two students between the time that Ms. Lynch took her first action until that following February. That's like saying there was no inappropriate touching until it was inappropriate touching. That's what you just said. That is the case. That is the facts of this case. Ms. Lynch took what she thought was appropriate action. There was no notice by the parent or anyone else that there was any other action that she needed to take to do anything else in that classroom or outside the classroom, and therefore what she did was not clearly unreasonable under the facts of this record. Why shouldn't a jury decide that question, that it was clearly unreasonable? Isn't that subject to facts in the case and what is clearly unreasonable? I think it's not a jury question in this case because the judge, I think a trial judge has the ability, as Judge Kearney did, to look at the facts in the record, to determine what facts were presented by the opposing party, which were none, to support their contention that they weren't separated and something else happened. So I think under those facts in the summary judgment record, which is their burden to come forward, I think a court can grant summary judgment. In this circumstance, there's not enough facts for this judge to find that a jury could find that it was clearly unreasonable. What role did the 2016 episode play in this? Following up on what my colleagues are asking is, there were steps taken and then another event happened. Should that be an indicator to a jury, perhaps, or the judge, as to whether those initial responses were reasonable? In terms of the deliberate indifference standard, Your Honor? Yeah. I think, Your Honor, the fact that something happened a second time is not enough to get to a jury at all because I think if we're looking at the first incident, was the action clearly unreasonable? That's the discussion that the trial court has to look at. Of course, something happened a second time, but I don't think you can impute the knowledge of something happening a second time back to what the officials knew at the time when they acted based upon the understanding of what the type of conduct was at issue. So that's how I would respond to that, Your Honor, in terms of... Is there or is there not a factual dispute? It seems like you are agreeing, in fact, to the facts of this case. Well, there's a set of... It's not a factual dispute that Ms. Smails reported the incident to Ms. Lynch. It's not a factual dispute, a material factual dispute, that Ms. Lynch took action. It's not a factual dispute that after she took action there was no inappropriate conduct. And that they were kept in the same classroom? That's not a factual dispute either. That's not. Right. So you're saying there's no dispute of fact? Well, it's... And that the facts are what they are and they were sufficient for the judge to grant summary judgment. Is that your position? Our position is that what Ms. Lynch did was... It's undisputed. I guess the answer is yes because we don't think it rose to the level of deliberate indifference. I can't throw you a better song. Judge Boyd, I guess the answer to your question is what Ms. Lynch did did not rise to the level of deliberate indifference. And the Court should be aware that these individuals were actually defendants in this case under 1983, and the plaintiffs have abandoned those claims against them in terms of their actions as to whether or not their actions alone were conscious shocking, which leads me into the 1983 issues. If the Court would like to hear those, I mean, they've not identified a policy that was the moving force behind the alleged constitutional violation. And in terms of Judge Kearney's opinion, he found that there was no underlying constitutional violation, and under Campbell v. Grazier, absent an underlying constitutional violation, there cannot be any municipal liability. And that's where the judge ends it. The judge also looked at whether or not there was a state-created danger in this case that what the plaintiffs argue, and I believe it's at page 54 of their brief, they argue that the district could have done more, but we all know that doing more or not acting or failing to act doesn't give rise to an affirmative act under L.R. and under Westmoreland. So I think Judge Kearney on the 1983 claim should be affirmed for those reasons. Thank you. I just wanted to make one more point. The plaintiff has argued that the judge relied on blurbs. Can you come closer to the mic? I can hear you, but it's being recorded. The plaintiff has argued that Judge Kearney relied on some blurb documents to create some kind of issue of fact. Well, we supplemented the appendix with the appendix to show exactly what Judge Kearney received because we realized that the judge received some documents that were blurb, so we immediately updated the record with Judge Kearney. So for the plaintiff to suggest that the judge didn't have legible copies when he made his decision on the deliberate indifference issue is just not true. Thank you. You've got a laptop and a computer. An iPad and a laptop. That's pretty intimidating. I saw a little laptop. May I proceed? Sure. May I address Mr. Sams, the state actor, question? And then 1983. The focus in the decision and the focus that I hear from Mr. Sams, and it's kind of been the theme all along, is who determines the hours? Who determines how many hours are going to be provided? And that's relevant to what's in the IEP. But once a document is in an IEP, that IEP becomes the child's contract for FAPE, for their free appropriate public education, which is how we measure if a student, if IDEA is being followed. But that doesn't mean that those who are providing the services required under an IEP necessarily are state actors. But if they aren't providing those services to the appropriate level to provide a FAPE, ultimately, these are non-delegable duties. That's my ultimate argument. Ultimately, it's the school's responsibility to carry out the IEP. In the cases, this wouldn't be the case here, in the case of charter schools, where if a charter school goes bankrupt, which happens. But there's no allegation that her IEP has been not complied with, or there's no FAPE claim. That's right. You're not bringing a FAPE claim here. I'm not sure where you're going. So because these services in the IEP, and we had the underlying FAPE claims, and that's why the underlying case settled, and regardless of if they violated FAPE. But because in her IEP, she was supposed to have this supervision. And because, regardless of how many hours, it gets in the IEP. Because Carson Valley's the one providing the body. I have no idea why this is relevant. Help me understand why you've lost me or how you've lost me. So if you're the IEP, once something's in an IEP, this becomes a contract between the school and the student. And if the IEP's not being followed perfectly, the school is liable. So however it gets followed, that's for the school to make sure the IEP's being implemented. So are we talking about Title IX? Are we talking about state-created danger? Are we talking about MNOW? Are we talking about state action? What are we talking about? This is Carson Valley as a state. The IEP, of course, because it's a child with special needs. Is it just because they develop an IEP that suddenly they become state actors because it's accepted by the school system? No, not at all, sir. But once it's in the IEP, how it's carried out now, that's the school's responsibility. Excuse me. What? Once what is what in the IEP? Once anything's in an IEP, it becomes the school's responsibility to implement those services. Right. Right? So here we have supervision. The school can hire their own person, and that's what they typically do. Let's remember we're talking about Carson Valley, and we're talking about who hired Carson Valley, who brought Carson Valley or its predecessor to the table. Carson Valley was utilized by the school district through Mother's Insurance to carry out parents' IEP. How bad if they're independent contractors? Does that make them liable? If they're carrying out a function of the IEP. These, again, these are non-delegable duties. Once it's in the IEP. Well, they develop the IEP for the school system, and I suspect as independent contractors, but you say just because of that relationship they become state actors? They don't have to be a part of the IEP process. So the IEP, there's a team meeting, and IEP's developed. Then you have this contract that says this student needs 30 hours of speech per year. You either hire a speech person that works for your school or you outsource it. If you outsource your speech, and this person is awful, and they don't provide the student with speech services, the school's liable for that, and they didn't provide the. Liable under what theory, though? Under IDEA. Okay. This is not an action under IDEA. Right, but because. That's what I started out with. Because that's why they, and that's right, Judge McKee, but because they're utilizing this to carry out IEP services, they become a state actor. So it doesn't matter who put the hours in. So every time a private entity enters into an agreement or contract with a school to provide IDEA services, as long as it's a public school, they become a state actor? Right. They're non-delegable duties, correct. And it said in 1983 claims, because I know I'm running out of time. You have case support for that. Do you not? Case support. What case do you rely on for that proposition that the school is now liable because they accepted this plan from Carson Valley? No, once it's in the IEP. All right. Once it's in the IEP, then that's. In the individual education plan, yeah. Right, so we're relying on IDEA, really, that it's the school's responsibility. Okay, but they're then liable for breaching the agreements under the IDEA. That's what you're arguing. Correct, if the IEP is not being followed. Right. But this is not. It doesn't make them a state actor in 1983. It doesn't make an IDEA action, either. You're not bringing an IDEA action. Let's assume they're a state actor. How does that help you here? For Carson Valley? Right, you're saying that Carson Valley breached the IDEA. No, Carson Valley, it wouldn't matter to Carson Valley. They're not liable for breaching the IDEA. You're trying to get the education system as responsible in this case. No, ultimately, yes, but I'm using it as an analogy. You just said no and yes. Help me. Which road should I go down? Should I get on the no road or the yes road? Yes, the school would ultimately be liable if Carson Valley fails to carry out the IEP, but by the school activating Carson Valley to be the one-to-one and utilizing them, they're using these individuals to provide FAPE to the child. So, again, there's several cases I can follow up with beyond just what's in IDEA. Why, once something's in an IEP, it's the school's responsibility to provide those services once it's in an IEP. That's a very broad pronouncement, I think. Every school hereafter will be responsible and every board of education will become a state actor whenever they fail to carry out an independent contractor's plan. Typically, a school handles the implementation of an IEP in-house. So maybe a child gets counseling, they go to the counselor. Maybe a child gets, again, speech, they go to the school speech person. Sometimes they'll outsource those services, but ultimately it falls back on the school to provide. If you say a child needs a laptop and it's in the IEP, you have to buy the child a laptop because this is your contract that governs the student's receipt of FAPE. So by you saying this child needs supervision and once it gets into that IEP document, then this now supersedes everything and it's the school's responsibility to carry that out. They can utilize outside people, but by doing so those people actually become state actors because they're being utilized to carry out FAPE. With your permission, if I could just do one follow-up. You had drew our attention to JA 340 as record support for your assertion that there were multiple encounters between the two students after the February date. But that email is from March and it makes reference to the March episode that was being described in 2015 and it talked about the fact that the plaintiff mentioned something to her mother about talking to him, meaning the other student, talking to him about touching his private parts. And I know you and I spoke at times. She was initiating the contact, putting aside who was the initiator. This episode is describing things that happened before the March event. And please correct me if I'm wrong. Is it your representation that after the March 2015 event, there was more contact between them about which the school had noticed? And I'm sorry, Judge, so that I wasn't – yes, no, let me answer that clearly. Let me answer that clearly. The allegation was that at least at the time of the March event, based on this email, it's clear that it's multiple times. That the two of them had some encounter more than once. Right. But after the event, when the school was on notice, you are telling us there is nothing in the record that would tell us there was anything else the school would know about until the February 2016 event. Am I correct? That's correct. Okay. Right. So that's correct. This is going to sound redundant, but could you just restate the specific failures by the school district to separate MJG and RD? So, yes, Your Honor. So back to the 1983 policies, their policy that there's only one classroom for students such as Marquetta. So that alone, that makes it impossible for them to separate it based on their own policies. Well, that sounds like a defense why we didn't do it. To do it within that school, right? There's many, many options. There's every other school in the school. They're using that. They're saying it was impossible. It was not impossible. They should have separated them into different schools. They could have put them in different schools. They could have rearranged how the life skills program works. They could have adjusted the age ranges. They could have separated it into separate classrooms. And there are different schools that could have provided the same exact service. Absolutely. And ultimately she went to a school that's providing significantly better services, or she's currently at Elwyn. They could have sent one of the children there. They could have kept them in the same room but sexually educated them. If they had to, they say they had to keep them in the same room, which they absolutely didn't. Again, this is just their man-made policy that no matter what happens, no matter what happens, we have to keep these two students in the same room. We can't do anything else. When, in fact, they can do everything else. There's schools within just short walks that can provide the exact same program. Again, this is a life skills program. It doesn't take so much. And who should have been moved under your theory? Should it have been the student or should it have been the aggressor? Under a Dear Colleague letter from October 2014 for the Office of Civil Rights, there's commentary that you shouldn't re-victimize the victim. So they say that the target of bullying, but also it would be harassment, shouldn't be moved. The student would have accepted the move, but ideally the assailant would be the person moved, ideally, under the Dear Colleague letter. It would have required a different school and maybe a different teacher or an additional teacher. Is that accurate? An additional teacher and an additional classroom could have done the trick, and then you split the students up. They're constantly regrouping classrooms in the school district of Philadelphia. Children are being moved around all year long. There's programs opening and closing. Thank you very much. Thank you very much. Thank you. I take the matter into advisement. We thank all of you.